## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **NINA IMMERS, as REP.** | § | **CASE NO: 4:**23-cv-00581 |
| **OF THE ESTATE OF** | § | |
| **JOHN GARDNER, DECEASED** | § | **COMPLAINT FOR** |
| | § | **NEGLIGENCE,** |
| *Plaintiff* | § | **WRONGFUL DEATH, ET AL** |
| | § | **BASED ON DIVERSITY** |
| **V.** | § | **ELECTRONIC FUNDS TRANSFER ACT** |
| | § | **AUTOMATIC PURCHASE RENEWAL** |
| **LIFE ALERT EMERGENCY** | § | |
| **RESPONSE, INC.** | § | **UNFAIR COMPETITION LAW** |
| | § | |
| **Defendant** | § | **PLAINTIFF'S JURY DEMAND** |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HON. JUDGE OF SAID COURT:**

NOW COMES, Nina Immers, as Executrix and Representative of the Estate of John Gardner, complaining of Defendant Life Alert Emergency Response, Inc., sometimes simply "Life Alert" and for causes of action would show the Court the following:

### PLAINTIFF

1. Plaintiff, Nina Immers, for the Estate of John Gardner and Individually, is an individual whose address is 1669 S. Main, Virginia City NV 89440. The last three digits of Plaintiff's. The last three digits of Plaintiff's Social Security number are 671.

2.At all relevant times, John Gardner, was a resident of Houston, Harris County, Texas, and a customer and consumer of services of Defendant. John Gardner is deceased.

## DEFENDANT

3.Defendant, **LIFE ALERT EMERGENCY RESPONSE, INC.** sometimes simply **"Life Alert"** is a corporation with headquarters who may be served at: **16027 Ventura Blvd, #400, Encino, CA 91436.** All references to Life Alert, herein, includes but is not limited to: its officers, employees, representatives, agents, and contractors, of Life Alert.

1 Defendant may be served with the summons by process by serving the Texas Secretary of State by certified mail at 1019 Brazos Street, Austin, Texas, as Defendant's agent for service. The Secretary of the State of Texas should forward the summons on to *Life Alert Headquarters, 16027 Ventura Blvd., Suite 400, Encino Ca., 91436*, 800-338-9090; Lic #ACO2866.

2. Defendant failed to appoint a registered agent as required by Section 5.201, Texas Business Organizations Code.

## JURISDICTION

1. This Court has jurisdiction over Life Alert under Section 17.042(1), Texas Civil Practice and Remedies Code, because said Defendant contracted with a Texas resident and either party is to perform the contract in whole or in part in this State, Life Alert subjected itself to the laws of Texas notwithstanding the unfair adhesion contract boilerplate claims on the Contract of Life Alert which Plaintiff contends such is or specific provisions and paragraphs should be declared void because the terms are manifestly unfair and unjust including but not limited to all and/or parts of Paragraphs 4, 5, 7, 8, 17, 18, 19, 20, 21, limiting the liability to $250.00 even involving death cases, changing the statute of limitations for wrongful death cases, contracting away a party's right to jury trial, and other valuable rights, essentially claiming that exclusively the party to the contract is the only one who may be entitled to bring a claim against Life Alert and excluding the representative of a Decedent's estate from prosecuting any claim. All injuries and

damages to Decedent were caused, inflicted, exacerbated, and/or led to the death of John Gardner in Houston, Harris County, Texas.

2. Life Alert promised and undertook the duty to contact local emergency services to be sent to the residence of Decedent if as and when he issued an alert; knowing that Life Alert advertised to Seniors that they would be protected knowing if they fell, Life Alert would contact emergency services and John Gardner's emergency contact because it was foreseeable that a fall could render a senior incapacitated as it did in the case of John Gardner.  Life Alert  apparently received the alert, but entirely failed to ensure that emergency services would be notified to rescue John Garder.

3.Instead John Gardner lie on the floor, suffering, resulting in dehydration, shock and eventual death.

## VENUE

1.  Venue is proper in this county under Section 15.035(b), Texas Civil Practice and Remedies Code because this is an action based on  wrongful death and a contract obligation of Defendant to pay money to Defendant arising out of a consumer transaction for goods, services, loans or extensions of credit intended primarily for personal, family, household, or agricultural use, and in writing with an obligation to be performed in this county by a California corporation.

### Supplemental Authority for Retaining Jurisdiction in

### Houston, Harris County, Texas

1.  The damages sought in this suit are within the jurisdictional limits of the Court. As required by Rule 47, Texas Rules of Civil Procedure, Plaintiff state that Plaintiff seek monetary relief, in addition to other remedies and claims, for the life of John Gardner, valued over $1,000,000.

2.Pursuant to the Texas Civil Practice and Remedies Code, relevant caselaw and statuttes, Texas has jurisdiction over Defendant including pursuant to the Due Process Clause**.**

3. "[a] federal district court may exercise personal jurisdiction over a nonresident defendant when'(1) the forum state's long-arm statute confers personal

jurisdiction over that defendant; and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." Fintech Fund, FLP v. Horne, 327 F. Supp. 3d 1007, 1016–17 (S.D. Tex. 2018) (quoting McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009)).which provides, in the context of federal claims outside state-court jurisdiction, that "'[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.'")

4. "A state court may assert personal jurisdiction over a defendant only if both (1) jurisdiction is authorized by state law, such as by its long-arm statute, and (2) asserting personal jurisdiction is permissible under the Due Process Clause of the Fourteenth Amendment." 4A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1069 (4th ed. 2021). Texas—"…enacted jurisdictional statutes that either have expressly incorporated the due process standard or have been interpreted to extend to the limits of due process," inquiring whether the assertion of personal jurisdiction satisfies the requirements of due process. Id.

5. "..[A] state court's assertion of jurisdiction exposes defendants to the State's coercive power," it is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause," Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 918 (2011), which "limits the power of a state court to render a valid personal judgment against a nonresident defendant," World-Wide Volkswagen [Corp. v. Woodson, 444 U.S. 286, 291 (1980). The primary focus of our personal jurisdiction inquiry is the defendant's relationship to the forum state.

6. The minimum-contacts analysis—whether conducted in federal or state court—is backstopped by an final inquiry into whether the exercise of personal jurisdiction in a particular matter would offend traditional notions of fair play and substantial justice. Walden v. Fiore, 571 U.S. 277, 283 (2014).

7.For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place,

one in which the corporation is fairly regarded as at home." Id., at 924, 131 S.Ct. 2846.

8.A court with ***general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State.*** Id., at 919, 131 S.Ct. 2846.

9. However, "only a limited set of affiliations with a forum will render a defendant amenable to" general jurisdiction in that State. Daimler, 571 U.S., at —— –, 134 S.Ct., at 760.

10.Specific jurisdiction is very different

1***For a state court to exercise specific jurisdiction, "the suit " must "aris[e] out of or relat[e] to the defendant's contacts with the forum***." Id., at ——, 134 S.Ct., at 754 (internal quotation marks omitted; emphasis added); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472–473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

2 In other words, there must be "an affiliation between the forum and the underlying controversy, principally,

a. [an] activity or an occurrence that takes place in the forum State and

b. The activity or occurrence is therefore subject to the State's regulation." Goodyear, 564 U.S., at 919, 131 S.Ct. 2846 (internal quotation marks and brackets omitted).

c. For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." Ibid. (internal quotation marks omitted). 137 S. Ct. at 1780.

d. that a nonresident corporation's "continuous and systematic contact" with the forum—if sufficiently pervasive—could subject that nonresident corporation to personal jurisdiction in the forum in connection with litigation unrelated to those forum contacts

e. to exercise ***general* jurisdiction over Goodyear USA's foreign subsidiaries**, the Supreme Court first reaffirmed an often-overlooked statement in International Shoe that **"[a] corporation's 'continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity**." Id. at 927 (citing Int'l Shoe, 326 U.S. at 318). Instead, Justice Ginsburg wrote, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them **when their affiliations with the State are so 'continuous and systematic' as to render them *essentially at home in the forum state.***" Id. at 919-929 (emphasis added)

f. **For a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. I**

   a. On the other hand, "[w]ith respect to a corporation, the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction." Id. (alteration in original) (internal quotation marks omitted).

   b. Court wrapped up its reasoning with a number of statements that seemed to leave open the possibility of finding general personal jurisdiction over a corporation in a forum where it was not incorporated or did not keep its principal place of business, and while it provided little guidance on how to recognize such a case when it arrives this case appears ripe for filing general personal jurisdiction for Life Alert based on the facts including that Life Alert promised to reach out to DO MORE than merely engage in retail sales such as selling tires, or performing essentially one party activities with the buyer.

   c. In this case, Life Alert essentially constituted a virtual "home" by agreeing as part of the agreement to engage and connect with emergency services in Houston, and/or Harris County Texas thereby bypassing the Customer, John Gardner in order to protect John Gardner..

d.  . . .. Accordingly, the inquiry under Goodyear is not whether a foreign corporation's in-forum contacts can be said to be in some sense "**continuous and systematic**," it **is whether that corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State**." 564 U.S., at –––––, 131 S.Ct., at 2851.19.

e.  In this case, Life Alert promised to monitor John Gardner's pendant with his alert button, 24/7, every month, every year from the inception of the contract 10-13-15 through the date of death, 2/16/21.

f.  Plaintiff asserts that in addition to the continuous and systematic contacts between the customer John Gardner, now deceased, and Life Alert, Life Alert went further to promise to align with emergency services to contact them to rescue John Gardner in the even of an alert. This promise had nothing to do with John Gardner except that he pressed the alert for help.

g.  Life Alert, obligated its employees, representatives, officers, and contractors to communicate and notify the emergency services  on a 24/7 basis for John Gardner to ensure that they would go to rescue John Gardner, whenever his Alert  was activated. By monitoring John Garner 7 days a week, 24 hours a day and representing itself as being in communication with Houston and Harris County Emergency services, Life Alert adopted Texas as Life Alert's virtual home state using the services of Houston and Harris County based on Life Alert's promises and assurances.

a.  As Justice Sotomayor stated essentially that there is nothing unfair about subjecting a massive corporation to suit in a State for nationwide course of conduct that injures both forum residents and nonresidents alike. Id. at 1784 (Sotomayor, J., dissenting). Justice Sotomayor explained that "the upshot of the opinion is that a Plaintiff cannot join their claims together and use a defendant in a State in which only some of them have been inured."

a. **JURISDICTIONAL AMOUNT**

    a.  The amount in controversy exceeds $75,000.
    b.  There exists complete diversity.

b.  **PERFORMANCE OF CONDITIONS**

    a.  Plaintiff performed or accomplished all conditions precedent.

## FACTS

11.  The decedent, John Gardner,  was a customer of Life Alert.  He unknowingly entered into a contract of adhesion on or about 10-13-15, for services to be performed by Life Alert. John Gardner, a Houston, Harris County, Texas resident paid $98.00 per month, beginning on 10-13-15 through the date of his death based on the promises and warranties which constituted duties of Life Alerrt. Life Alert continued to bill John Gardner and his account after his death.

12.John Gardner faithfully paid $98.00  each month knowing that his payment guaranteed the privilege of sending an alert to Life Alert to be protected in the event that he was incapacitated and was unable to call for help himself.

13.We are well within the limitation period for breach of any contract provisions. California Code of Civil Procedure section 337.

14. Wrongful Death.  CCP 377.60 allows the following family members (or their personal representatives) to bring a lawsuit:

15. Nina Immers is physically impaired and she relied on Decedent for financial support.

### GROSS NEGLIENCE

Life Alert is liable for knowing catastrophic neglect. This neglect by Life Alert was so terrible that that it constitutes gross negligence.

    a.  Life Alert received the Alert that the notice alarm was activated.

    b.  Life Alert had knowledge that the alert button had  been activated.

    c. With full knowledge that Life Alert had been alerted to an emergency, Life Alert IGNORED John Gardner resulting in his death.

**DUTIES**

The services included and imposed the duties that included but were not limited to Life Alert <u>guaranteeing to monitor John Gardner's Pendant and console for any alerts by John Gardner</u>. This was Life Alert's sole obligation.

If Life Alert received an alert, Life Alert promised to contact emergency services and his emergency contact.

But Life Alert never bothered.

    *a.* Life Alert ® is a registered trademark of Life Alert Emergency Response, Inc., sometimes simply "Life Alert" herein. Life alert advertised in Houston, Texas with claims of assurance and protection with promises of prompt notification to EMS and/or police and with other information calculated to induce John Gardner to purchase the services of Life Alert for his protection including but not limited in the event of falling.

    *b.* Life Alert induced assurance including by stating it is the leading emergency response company in the country, dedicated to solving home safety issues. As Life Alert states in the advertisements on which John Gardner relied, in relevant party: Life Alert's "membership cost less than one month at a retirement institution.

    *c.* With this amount savings, Life Alert allows seniors to live protected and independently in the comfort of their own home with 24 hour medical alert service at the push of a button. *If a Life Alert Personal Medical Alert System can substitute a retirement institution, would you go for it?"*

    d. *John Gardner, a relatively healthy gentleman about 82 years old, was convinced by the Life Alert advertising and claims, and he sought, and he relied on the protection especially involving fall protection based on the Life Alert claims and he contracted for 24 hour protection of immediate response. It was the guarantee of Life Alert was when the*

*agents, contractors and employees of life alert that John Gardner relied on.*

e. In relevant part, Life Alert advertises similar to these claims: Senior fall at home emergency. In relevant Party, Life Alert provides the following:

f. "Help, I've Fallen and I Can't Get Up"® In a home emergency, such as a fall, seizure, heart attack, stroke or other serious illness a senior may not reach the telephone and can lie on the floor for hours or days, disconnected from any help. That's when a medical alert system can save their life by summoning help fast before an injury becomes life threatening.



1. Whether it's accidental, medical, fire, or a home invasion emergency, Life Alert sends help, 24/7, even when you can't reach a phone. Life Alert guarantees if the button is pressed, life alert will contact the customer, and if Life Alert is not able to reach the customer, they would immediately notify assistance, such as the police and/or ambulance."

2. Life Alert failed to notify assistance such as police and/or ambulance immediately . Life Alert failed to notify assistance such as police and/or ambulance at all.

3. John Gardner lived alone with the security of knowing he just had to press the Life Alert button on the pendant that he wore around his neck at all times for protection in the event of any fall or other event requiring assistance. At all times John Gardner wore his Life Alert pendant. The pendant and the console appeared to be in good working order.

4. John Gardner pressed the button on his pendant as a call for help because John Gardner had slipped in his bedroom and he had fallen and could not get up. Life Alert apparently acknowledged that the Life Alert did receive a notification from the life alert button of John Gardner; however, there was no evidence that Life Alert ever notified any police, ambulance and/or health care emergency service or to his emergency contact, his daughter, Nina Immers.

5. Life Alert had a duty to contact emergency services and his emergency contacts when Life Alert was unable to reach John Gardner because he was unable to reach a phone. Life Alert's breach of their duty, when he relied on their performing the duty as they promised.  Further, it was foreseeable if Life Alert failed to contact the local Harris County Texas Emergency Contacts which constituted his life saving contacts in his time of peril constituted a breach of their duty that would cause injury to John and for John Gardner's death. which would have been avoided if the officers, employees, agents, representatives, and/or contractors of Life Alert had performed the services which had been contracted for by John Gardner and that duty by  Life Alert was breached resulting in his injuries being exacerbated directly resulted in his death.

6. On entering, John was found barely conscious, in shock, dehydrated still lying on the floor in a puddle of his excrement. Unfortunately, he never regained consciousness and died shortly after being transported to the hospital.

### PLAINTIFF DENOUNCES ALL OR PORTIONS OF THE CONTRACT WITH LIFE ALERT AS CONSTITUTING AN UNFAIR, ILLEGAL CONTRACT OF ADHESION WHICH PARTS MUST BE DECLARED VOID

An adhesion contract, or contract of adhesion, is defined by Black's Law Dictionary as a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract. Life Alert focuses its advertising on seniors, the most vulnerable segment of the

population, and it is those citizens who have contributed to society and the community all of their lives and are most easily taken advantage.

A distinctive feature of an adhesion contract is that weaker party has no realistic choice as to its terms." Blacks Law Dictionary (West 5th Ed. 1979), page 38. In *Grand Prospect Partners, L.P. v. Ross Dress For Less, Inc.* (2015) slip Cal.App.4th 2015/f067327, the California Courts of Appeal for the Fifth District described an adhesion contract as: "(1) a standardized contract (2) imposed and drafted by the party of superior bargaining strength (3) that provides the subscribing party only the opportunity to adhere to the contract or reject it." *Grand Prospect* citing *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000).

Plaintiff intends to prove that the agreement that John Gardner was induced to sign was a contract of "adhesion." Many Paragraphs and/or parts of paragraphs are so overreaching, that they should or must be declared to be so unfair as to be illegal.

### CONTRACTS OF ADHESION MAY BE CONSIDERED TO BE "UNCONSCIONABLE" AND UNENFORCEABLE BY CALIFORNIA COURTS.

The courts have found various contracts to be adhesive and unconscionable in a variety of instances, including but not limited to: Medical arbitration contracts. Commercial arbitration contracts.

In the matter of Life Alert, it claims to change the statute of limitations from two years to one year; claims to do away with the right to a jury trial; claims to limit liability to $250; limits claims to be exclusive brought by the contracting customer; etc. Given the significance of this case, and the importance to the senior community, Plaintiff asks the Court to strike and/or vacate all paragraphs and/or parts of paragraphs which constitute unconscionable overreaching under the circumstances.

### CAUSES OF ACTION

### NEGLIGENCE

1. Life Alert's failure of the main duty it promises in return for the payment each month of $98.00 per month, resulted in injuries, exacerbated injuries directly leading to the death of John Gardner. Life Alert is liable for negligence.

   a. Life Alert's most important duty was to monitor the alert pendant and console and its most important duty was to alert emergency services when it received an alert.
      i. There is no evidence the console failed to perform;
      ii. There is no evidence the pendant failed to perform;
      iii. The evidence is that the officers, employees, representatives, agents and contractors under the supervision of Life Alert entirely FAILED to perform the single most important duty in case of John Gardner.
      iv. Life Alert entirely failed to notify the emergency services and if Life Alert had performed that duty, John Gardner would be alive today.
      v. Life Alert had the absolute duty to perform as promised.
      vi. As a condition of John Gardner paying at least $98.00 per month, that Life Alert promised to perform to the duty to act as a reasonably prudent corporation in the same or similar circumstances.

   b. By contracting with John Gardner, Life Alert specifically undertook the duty, obligation and responsibility to train, educate and ensure that all its officers, representatives, employees, agents, and contractors, were knowledgeable about what to do when an alert was registered by John Gardner.

   c. The single most important mission for Life Alert was to ACT when it received the alert and to CONTACT the emergency services to make certain that John Gardner was rescued.

   d. Life Alert advertised to seniors. Life Alert is charged with the knowledge that when an alert is registered, a life or death emergency is registered by the customer who pressed that button.

e. Life Alert bragged about their guaranteed responses to an alert and they even called their product "Life Alert" because it made the difference between life and death.

f. Life Alert induced John Gardner to rely on Life Alert to save his life and to rescue him.

g. However, Life Alert never bothered to heed the emergency activation.

h. Life Alert apparently permitted an atmosphere among its employees, agents, representatives, contractors and officers, where no one even bothered to care about John Gardner who lay on his floor in his fluids from his body, dying.

i. Life Alert did not even care enough to follow up.

j. Life Alert had zero protocols to follow up on those of whom they were unable to reach, so Life Alert ignored John Gardner's call for emergency help, and let him languish until his last breaths were gone. But Life Alert did not care, yet they continued to charge John Gardner after his death.

k. Life Alert breached their duty by failing to notify the emergency services and emergency contacts which was their signature duty, yet they never cared contrary to their assurances, promises and guarantees.

l. The breaches of Life Alert in the duties it undertook, including in its advertising, promises, agreements and assurances, resulted in John Gardner being robbed of the emergency services he paid for to rescue him.

m. Instead, Life Alert ignored his signals as he lay gasping for his last breaths, dying on the floor incapacitated and waiting on the floor of his residence, helplessly, with no food or water, and with broken bones, until a neighbor eventually broke into the residence to try to do a welfare check no response.

n.  Nina, his beloved daughter, was never even notified of his death until about nine days after his death notwithstanding that she was the main emergency contact with Life Alert.

o.  Life Alert's failures and breaches of their duty resulted in John Gardner lying on the floor, helplessly, eventually resulting in his dehydration and his body into shock from starvation and dehydration, until his almost lifeless body was rescued by a neighbor.

p.  The breaches by Life Alert are numerous, which include but are not limited to:

i.  Neglect. Life Alert's acts of nonfeasance, misfeasance and malfeasance are many, including those set forth herein.

ii.  Failure to immediately contact emergency services of Harris County, Texas, failure to immediately contact an ambulance services of Harris County, Texas,

iii.  Failure to contact the police and/or law enforcement in Harris County, Texas;

iv.  Failure to immediately contact the emergency contact provided b John Gardner, which include to contact his Adult Daughter, who is now the representative of his estate, Nina Immers.

v.  The failures of Life Alert resulted in the exacerbated injuries, shock, deterioration of health, dehydration and the ultimate death of John Gardner.

vi.  Failure to properly educate the employees, representatives, agents and contractors of Life Alert as to the duty of responses upon receipt of an alert from John Gardner.

vii.  Failing to train employees, and the term "employees" includes for all purposes but is not limited to include officers, representatives, agents and contractors herein;

viii.    Failure to supervise the employees;

ix.    Failure to properly educate the employees regarding protocols and duties;

x.    Failure to educate the employees regarding what emergency services to contact;

xi.    Failure to ensure the employees understood how to contact the emergency services of Harris County Texas to perform as the customer, John Garner, relied to faithfully pay for the services each month.

q.    Failure to take proper and appropriate  actions pursuant to the agreement which included to keep the Plaintiff in a reasonably safe;

r.    Failure to  act as Company /person of ordinary prudence would have done under the same or similar circumstance;

s.    Failing to provide safety tools and equipment that is the basis of this lawsuit;

t.    Failing to ensure employees were knowledgeable regarding the protocols and requirements when an alert is detected.

u.    Failing to install, adopt or employ adequate safety measures in its workplace to prevent incidents such as the one that injured Decedent resulting in the death, and is the subject of this lawsuit.

v.    Each of such acts and omissions, singularly or in combination with others constituted negligence, gross negligence, and negligence per se which proximately caused the incident, and which resulted in the death of John Gardner.

**PROXIMATE AND DIRECT NEGLIGENCE OF DEFENDANT**

Proximate and Direct Negligence Plaintiff re-alleges and incorporate the preceding factual account as set forth in Sections regarding "Facts" of this complaint fully at length. At the time and on the occasion in question,

Defendant owed duties to Decedent, including the duty to provide Emergency Services and Police as well as to contact the emergency contacts.

Defendant has the duty to use all necessary care to ensure safety of its customers and subscribers.

Defendant also owed the duty of reasonable care generally.

Defendant breached these duties in ways including, but not limited to:

1. Failing to supervise the employees, representatives, contractors and/or agents, ensuring protocols were in place for those monitoring the alerts, providing and requiring education and updating on procedures that needed to be in place as to whom to contact, and the steps after activation of the alarm.
2. Had the Defendant performed the proper actions and kept the Plaintiff in a reasonably safe environment -- as a Company / person of ordinary prudence would have done under the same or similar circumstance
3. Failing to provide the necessary tools and equipment necessary for the augmentation of the connection services that is the basis of this lawsuit;
4. Failing to install, adopt or employ adequate measures in its workplace to prevent incidents such as the that which occurred that killed John Gardner and is the subject of this lawsuit.
5. Each of such acts and omissions, singularly or in combination with others constituted negligence, gross negligence, and negligence per se which proximately caused the incident, and which resulted in the death of John Gardner.

# WRONGFUL DEATH

a.    Plaintiff asserts that Life Alert violated the laws of California, specifically, Life Alert is the Liable party and the suit must be brought 2 years from the date of death. This case is timely because John Gardner was pronounced Deceased on 2-16-21. Wrongful death begins to run at the time of death. <u>California Code of Civil Procedure 335.1.</u>

2.    Life Alert  had a certain duty of care owed to the victim, John Gardner;

3.    Life Alert  breached that duty of care as set forth above incorporating by reference all relevant paragraphs above describing the duties that Life Alert owed to John Gardner;

4.    Life Alert's  breaches  of its duty of care led to the exacerbated injuries from which John Gardner could not recover because Life Alert failed to notify any emergency services and/or contacts to rescue him resulting in his death. Such injuries and death were foreseeable, and could have been easily avoided had Life Alert performed its duties as promised. Had the Harris County Emergency services been immediately notified, then he could have been immediately treated at the hospital and would have recovered from the broken hip.

5.    The Death of John Gardner  resulted in losses to Plaintiff as John Gardner supported his adult daughter because she was impaired.

a.    In the alternative but without waiving the foregoing, Life Alert is also liable under the Texas wrongful Death Statute because all of the events occurred in Texas, the Plaintiff was at all times a Texas resident, the defendant promised to ensure emergency services located in Harris County, Texas, which were the sole responsibility of Life Alert, to engage their contacts in Harris County, Texas. However, based on the failures of Life Alert

i.    Losses under California law include but are not limited to:

6.    Costs associated with the funeral and burial of the decedent;

7.    Loss of future income;

8.    Loss of financial support;

9.    Loss of household services; and

10.    The loss of the decedent's love, companionship, comfort, care, assistance, protection, affection, society, moral support.

a.    WRONGFUL DEATH & SURVIVAL CLAIMS are also proper under Texas Law. In the alternative but without waiving the foregoing, Plaintiff re-alleges and incorporate the preceding factual account as set forth in Section IV of this petition fully at length. Defendants are liable for damages arising from

Decedent's illness/injuries exacerbated due to the misfeasance, nonfeasance and/or malfeasance of Defendant. Defendant's omissions of services that directly caused his death because Defendant's and/or its agents' or servants' inaction constituted wrongful conduct, neglect, carelessness, unskillfulness, or default. (See Tex. Civ. Prac. & Rem. Code Ann. § 71.002(b).)

b.      Additionally, Plaintiff seeks damages incurred by Decedent due to death as a direct result of Defendants' negligence pursuant to Tex. Civ Prac. & Rem. Code 71.021. All conditions precedent to the filing of this lawsuit bringing said causes of action have been performed or have occurred.

c.      DAMAGES This is a suit to recover monetary relief, based on the value of the life of John Garner and the acts and conduct of Defendant. The amount of monetary relief actually awarded, however, will ultimately be determined by a jury. These damages are sought from Defendants' negligence regarding an on the job injury which was ultimately fatal.

## BREACH OF CONTRACT
## BREACH OF WARRANTY

a.      We believe that Life Alert will stipulate that the parties entered into a contract for which John Gardner performed fully by paying each month his $98.00. There is no claim that the console and/or the pendant failed to perform because they performed to advance the alert properly.

b.      However, it was the officers, employees, representatives, agents and contractors who received that life or death alert, who did NOTHING. This abject failure resulted in the untimely death of John Gardner.

c.      A claim regarding any contract issue is timely. Four years had not elapsed since the breach of the contract by Life Alert.

d.      Life Alert breached its duty but it also breached its contract by failing contact John Gardner's emergency services and/or emergency contact leaving him to suffer helplessly on the floor of his bedroom unable to move, eventually resulting in the death of John Gardner.

e.      It was foreseeable if Life Alert failed to perform the services by contacting John's emergency contacts and failing to contact emergency services, that he would suffer resulting in his death.

f.      Life Alert violated the warranties as guaranteed and for which John paid. John performed all requirements, ie, he paid for the services, he pressed the

Life Alert Button. Life Alert failed to contact John's emergency contacts foreseeably resulting in John's death.

g.      We believe the parties will stipulate to their being a contract, Defendant breached its agreement, foreseeably resulting in damages irreversible to John Gardner.

h.      Defendant breached the warranty.

## THE ELECTRONIC FUNDS TRANSFER ACT AND CALIFORNIA AUTOMATIC PURCHASE RENEWAL STATUTE

1.      Defendant also violated the Electronic Funds Transfer Act,  and the California Automatic Purchase Renewal Statute Cal. Bus. & Prof. Code § 17600, et seq. as to John Gardner as a consumer of services.

2.      Plaintiff's Additional Count is brought pursuant to the Electronic Funds Transfer Act, 15 U.S.C. 1693 et seq. ("EFTA") and the California Automatic Purchase Renewal Statute Cal. Bus. & Prof. Code § 17600, et seq. ("CAPRS").

3.      After Defendant was notified of the death of John Gardner, Defendant continued to charge John Gardner for the subscription of services.

4.      This claim is brought without 4 years and is timely.

5.      Plaintiff, individually, and on behalf of  this estate brings this Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Defendant continuing to debit Plaintiff's and also the putative Class members' bank accounts on a recurring basis after Plaintiff and the putative Class members requested to cancel their services with Defendant, and that Defendant stop debiting their accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.l0(b).

6.      Similarly, Defendant's conduct also violates Cal. Bus. & Prof. Code § 17600 *et. seq*. Defendant additionally conditions its sale of services on an illegal "negative option" as defined by 15 U.S.C. § 8403. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

a.      Plaintiff also alleges that Defendant's conduct constitutes violations of California's Unfair Competition Law Cal. Bus. & Prof. Code § 17200, et seq. ("UCL"). Its agents, employees, contractors and representatives own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## JURISDICTION AND VENUE  FOR EFTA, CAPRS and UCL

1.      This Court has jurisdiction under 28 U.S.C. 1331, because this action is brought pursuant to the EFTA, 15 U.S.C. 1693 *et seq*. The Court has supplemental jurisdiction over the claims.

2.      Jurisdiction of this Court arises pursuant to 15 U.S.C. 1693(m), which states that, "without regard to the amount in controversy, any action under this section may be brought in any United States district court."

3.      Venue and personal jurisdiction in this District are proper pursuant to 28 U.S.C. 1391(b) because Plaintiff was a customer of Life Alert and all acts occurred in this County.

## PARTIES INVOLVING EFTA, CAPRS and UCL

1. Plaintiff, Nina Immers ("Plaintiff"), is a natural person residing in Nevada. She represents the estate of John Gardner, a customer of Life Alert, and he was a "consumer" and he resided in Harris County, as defined by 15 U.S.C. §1693a(6) and a "person" as defined by Cal. Bus. & Prof. Code § 17201.

2.      At all relevant times herein, Defendant, LIFE ALERT EMERGENCY RESPONSE, INC. ("Defendant"), was a California company engaged in the business of selling products and services used to contact emergency services such as emergency medical technicians, or police, to consumers, including those in California such as Plaintiff.

## FACTUAL ALLEGATIONS REGARDING

1.      Defendant is a California company engaged in the business of selling products and services used to contact emergency services such as emergency medical technicians.

2.    On or around 10-13-15, Plaintiff entered into an agreement with Defendant for its services.

a.    Defendant's salesperson represented to Plaintiff that the agreement was a month-to-month agreement, requiring payment to Defendant of $98.00 dollars on the 3rd day of each month. This payment was made by an automatic debit to Plaintiff's checking account made by Defendant.

3.    In reality, the agreement was a "negative option", requiring Plaintiff to inform Defendant and return Defendant's equipment in order to cancel the agreement.

4.    In or around March 2021, and thereafter, Plaintiff contacted Defendant and attempted to cancel the agreement with Defendant because John Gardner had died, but the executrix was unaware of the requirement to return the equipment and was not informed to do so.

5.    Despite receiving Plaintiff's notice of cancellation of the agreement, Defendant continued to automatically withdraw funds from Plaintiff's account in the amount of $98.00 dollars.

6.    Plaintiff, the Executrix, was surprised by this withdrawals and tried to obtain a charge back through her bank account.

7.    Defendant, however, challenged with charge back with Plaintiff's bank, and the bank allowed the charge to stand.

8.    Defendant withdrew funds from Plaintiff's account via recurring electronic fund transfers without authorization.

9.    . Further, Defendant did not provide to Plaintiff, nor did Plaintiff execute, any written or electronic writing memorializing the final automatic payment made on and after March.

10.    Plaintiff alleges such activity to be in violation of the Electronic Funds Transfer Act, 15 U.S.C. 1693 et seq. ("EFTA"), and its surrounding regulations, including, but not limited to, 12 C.F.R. §§1005.7, 1005.8, and 1005.9.

11.    Plaintiff alleges such activity to be in violation of California's Automatic Purchase Renewal Statute Cal. Bus. & Prof. Code § 17600, et seq. ("CAPRS"), and its surrounding regulations.

12.    At all times relevant, Defendant made and continues to make automatic renewal offers and continuous service offers, as those terms are defined by Cal. Bus. & Prof. Code § 17600, et seq. ("California's Automatic Purchase Renewal Statute") to Plaintiff and other consumers similarly situated.

13.    At the time Plaintiff purchased the services, Defendant failed to present Defendant's automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner, as defined by California's Automatic Purchase Renewal Statute, before the subscription or purchasing agreement was fulfilled, and in visual or temporal proximity to Defendant's request for consent to the offer.

14.    At the time Plaintiff purchased the services, Defendant charged Plaintiff for an automatic renewal offer without first obtaining Plaintiff's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms.

15.    At the time Plaintiff purchased Defendant's products and services, Plaintiff was subjected to Defendant's unlawful policies and/or practices, as set forth herein, in violation of Cal. Bus. & Prof. Code § 17600, et seq.

16.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

## UNFAIR COMPETITION LAW CLAIMS

1.    Actions for relief under the ***unfair competition law*** may be based on any business act or practice that is within the broad definition of the ***UCL.***

2.    Such violations of the UCL occur as a result of unlawful, unfair or fraudulent business acts and practices.

3.     A plaintiff is required to provide evidence of a causal connection between a defendant's business practices and the alleged harm--that is, evidence that the defendant's conduct caused or was likely to cause substantial injury.

4.     It is insufficient for a plaintiff to show merely that the defendant's conduct created a risk of harm. Furthermore, the "act or practice" aspect of the statutory definition of unfair competition covers any single act of misconduct, as well as ongoing misconduct.

**UNFAIR**

1.   California Business & Professions Code § 17200 prohibits any "unfair ... business act or practice." Defendant's acts, omissions, misrepresentations, and practices as alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

2.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Plaintiff reserves the right to allege further conduct which constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date.

3.   In order to satisfy the "unfair" prong of the UCL, **a consumer must show that the injury: (1) is substantial; (2) is not outweighed by any countervailing benefits** to consumers or competition; and, (3) is not one that consumers themselves could reasonably have avoided.

4.     Here, Defendant's conduct has caused and continues to cause substantial injury to Plaintiff and members of the CAPRS Class. Plaintiff and members of the Class have suffered injury in fact due to Defendant's charging exorbitant auto-renewal charges without clearly and conspicuously disclosing such charges or obtaining consent. Thus, Defendant's conduct has caused substantial injury to Plaintiff and the members of the CAPRS Class.

5.     Moreover, Defendant's conduct as alleged herein solely benefits Defendant while providing no benefit of any kind to any consumer.

a.      Such deception utilized by Defendant converted large sums of money from Plaintiff and CAPRS Class members without clear and conspicuous notice or obtaining express informed consent.

b.      This systematic scheme is tantamount to theft. Thus, the injury suffered by Plaintiff and the members of the CAPRS Class is not outweighed by any countervailing benefits to consumers.

6.      Finally, the injury suffered by Plaintiff and members of the CAPRS Class is not an injury that these consumers could reasonably have avoided. Defendant misappropriated funds from Plaintiff and other consumers, and these consumers suffered injury in fact due to Defendant's unexpected auto withdrawals. As such, Defendant took advantage of Defendant's position of perceived power in  order to deceive Plaintiff. Therefore, the injury suffered by Plaintiff is not an injury which this consumer could reasonably have avoided.

7.      Thus, Defendant's conduct has violated the "unfair" prong of California Business & Professions Code § 17200.

**FRAUDULENT**

1.      California Business & Professions Code § 17200 prohibits any "fraudulent ... business act or practice." In order to prevail under the "fraudulent" prong of the UCL, a consumer must allege that the fraudulent business practice was likely to deceive members of the public.

2.      The test for "fraud" as contemplated by California Business and Professions Code § 17200 is whether the public is likely to be deceived. Unlike common law fraud, a § 17200 violation can be established even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.

3.      Here, not only were Plaintiff likely to be deceived, but this consumer was actually deceived by Defendant. Such deception is evidenced by the fact that Defendant had a duty to clearly and conspicuously disclose its automatic renewal terms, failed to do so, and misappropriated significant sums of money from Plaintiff and CAPRS Class members, who reasonably relied on Defendant's representations that the agreements were on a month-to-month basis.

4.       Plaintiff's reliance is reasonable due to the unequal bargaining powers of Defendant and Plaintiff. For the same reason, it is likely that Defendant's fraudulent business practice would deceive other members of the public.

5.    Defendant's practices is an unfair, unlawful and fraudulent bait and switch scheme.

6.    Thus, Defendant's conduct has violated the "fraudulent" prong of California Business & Professions Code § 17200.

**UNLAWFUL**

1.  California Business and Professions Code Section 17200, et seq. prohibits "any unlawful…business act or practice."

2.    As explained above, Defendant deceived Plaintiff by deducting unauthorized sums from their accounts under a negative option scheme.

3.    As explained above, such conduct constitutes an unlawful act under Cal. Bus. & Prof. Code § 17600, et seq., 15 U.S. Code § 8403, and EFTA.

4.    Defendant's acts are therefore an "unlawful" business practice or act under Business and Professions Code Section 17200 et seq..

5.    68. Defendant's conduct caused and continued to cause economic harm to Plaintiff.

**COUNT III: VIOLATION OF CALIFORNIA AUTOMATIC PURCHASE RENEWALS STATUTE**

1.  Plaintiff incorporates by reference each allegation set forth above.

2.  ***The California Automatic Purchase Renewals Statute makes it unlawful for any business that makes an automatic renewal offer or continuous service offer to a consumer in this state to do any of the following***:

   a.  "(1) [f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled […]

   b.  [c]harge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms…" […]

   c.  [f]ail to provide an acknowledgement that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding  how to cancel in a manner that is

capable of being retained by the consumer…" California Bus. & Prof. Code § 17602(a).

3. By failing to provide Plaintiff with clear and conspicuous terms of its subscription services, continuing to charge them without their affirmative authorization, and failing to provide them with reasonable means of cancelling such subscription services, Defendant violated California Business & Professions Code § 17602(a)(1), (2), and (3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of the estate, respectfully requests judgment be entered against Defendant, for the following:

Plaintiff requests that Defendants be cited to appear and answer and that on final hearing or upon trial Plaintiff have final judgment against Defendants for an amount within the jurisdictional limits of the Court, together with interest at the lawful rate from the appropriate date until judgment, and post-judgment interest at the lawful rate, costs of court and for such other and further relief, at law or in equity to which Plaintiff is justly entitled.

b. Statutory damages of $1,000.00, pursuant to the Electronic Fund Transfer Act, §916(a)(2)(A);

c. Actual damages;

d. Restitution of the funds improperly obtained by Defendant;

e. Any and all statutory enhanced damages;

f. All reasonable and necessary attorneys' fees and costs provided by statute, common law or the Court's inherent power;

g. For equitable and injunctive and pursuant to California Business and Professions Code § 17203 and Cal. Civ. C. § 1780 et. al.;

h. For prejudgment interest at the legal rate; and

i. Any other relief this Honorable Court deems appropriate.

j. Plaintiff request judgment for reasonable attorney's fees and costs where permitted by law.

k. Plaintiff hereby request a jury trial.

Respectfully submitted,


Litigation Partners &
Sharon Hemphill & Associates
PO 11210
Spring, TX 77391


/s/ Sharon Hemphill
Sharon Hemphill
Attorney for Nina Immers,
for the Estate of John Gardner
Texas Bar no: 09413750
Phone: (713) 653-3122
Email: shemphill365law@aol.com